# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CRYSTAL L. NELSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-1311-JES-JEH |
| | ) | |
| VILLAGE OF MORTON, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND OPINION

Now before the Court is Defendant's Motion (Doc. 29) for Summary Judgment,
Plaintiff's Response (Doc. 30), and Defendant's Reply (Doc. 31). For the reasons set forth below,
Defendant's Motion (Doc. 29) is GRANTED.

### BACKGROUND[1]

Plaintiff, Crystal Nelson, was hired by the Village of Morton in 2002 as a 911 dispatcher.
During Nelson's employment with Morton, the dispatcher positions were staffed with two
dispatchers each for first and second shifts, and one dispatcher for third shift. Craig Hilliard is
the Police Chief in Morton, Jason Miller is the Deputy Chief, and Julie Smick is the Village
Administrator. As a 911 dispatcher, Nelson would answer emergency calls, enter the information
into a computer-aided dispatch program by using codes and by completing a freeform narrative
section, and use preprinted cards to ask the caller questions specific to the nature of the call. She
would also input a license plate or driver's license into the LEADS/NCIC program run by the
Illinois State Police and then send the response back to the requesting police officer verbally or
through the requesting police officer's in-car laptop computer. An essential function of Nelson's

---

[1] The following facts are undisputed by the parties unless otherwise noted.

job was the ability to see, because as a 911 dispatcher, she must be able to read the information on the relevant emergency response cards, input information from 911 calls into the computer, and make phone calls to the proper first responders. When Nelson had episodes of blurry vision, she was unable to perform the above duties. Nelson characterized her job as one "where lives could be lost if I make one mistake." Doc. 29, at 6–8.

## 1. Nelson's Vision Issues

In 2008, Nelson suffered from a detached retina in her left eye, causing permanent damage and making her effectively blind in that eye. Thus, as of 2008, Nelson relied almost entirely on her right eye to see. *Id.* at 7. On June 15, 2015, Nelson was working the midnight shift as the sole dispatcher when her vision in her right eye started to blur and continued to get worse until all she could see was light and shadow. Nelson was unable to read her computer and had to use a foot pedal to ask the sergeant to call her, prompting the sergeant to stay with her for a period of time before a replacement dispatcher could come in and her son arrived to take her to the hospital. Nelson was prescribed steroids for one week, but once she got off the steroids she started experiencing blurry vision again.[2] *Id.* at 7–8.

On June 16, 2015, Nelson requested FMLA leave after being diagnosed with optic neuritis in her right eye, which Nelson described as swelling of the optic nerve and intense blurring such that she could only see light and shadows.[3] Prior to June 16, 2015, Nelson never

---

[2] Nelson lists this statement of fact as disputed in her Response because "Nelson got a treatment regimen where her blurred vision stopped occurring prior to returning to work from her FMLA leave." Doc. 30, at 18–19. In addition to being factually questionable, Plaintiff's Response does not actually dispute Defendant's statement of fact at all. *See* Doc. 29-1, at 22 ("And I went back to work. And I don't recall the time frame. It was a day or two after I, and with stopping the steroids it came back. And then when I was admitted to the hospital it started again."); *id.* at 21 ("I went, after I stopped taking the steroids the blurry vision came back so I went into OSF."). Accordingly, the Court considers the statement undisputed.

[3] Nelson lists this statement of fact as disputed in her Response because "Defendant infers June 2015 diagnosis results in condition such that Nelson 'can only see light and shadows' as if it is ongoing when in fact she recovered from the condition." Doc. 30, at 12–13. This response fails to dispute the purported statement of fact and also fails to

had problems with her right eye. Except for the day or two that she worked while on steroids, Nelson was off work on FMLA leave due to optic neuritis from June 15, 2015 through mid-August 2015. While on FMLA leave, Nelson's treating physician, Dr. Adler, told her that he didn't know why her optic nerve was swelling and referred her to a neurologist, Dr. Jorge Kattah, who saw Nelson on July 13, 2015 and advised her that he didn't know what was causing her vision problems either. The same day, Dr. Kattah completed FMLA paperwork indicating that Nelson's condition was improving but Nelson was unable to perform any of her job functions due to the condition and he could not tell at that time how long she would be incapacitated. *Id*. at 8–9.

On August 12, 2015, Nelson sent Deputy Chief Miller a note from Bond Eye Associates releasing her to return to work beginning August 17, 2015, stating that Nelson was "still light sensitive / incandescent w/ lights." Dr. Bond also provided a note to Morton stating "due to patient's current diagnosis of severe photophobia, the patient cannot tolerate fluorescent lighting and needs table lamp lighting to perform daily job requirements. If any other questions arise feel free to contact my office." *Id*. at 9.

After receiving the doctors notes, Administrator Smick decided that Nelson's request should be handled administratively rather than through Chief Hilliard. In her deposition, Smick testified that her main goal was trying to get information so that she could do the best things for Nelson, but Dr. Bond's recommendations were not clear to her.[4] After receiving the doctors notes, Smick tried calling Dr. Bond with additional questions, but Dr. Bond refused to speak with

---

cite to any evidence, as required by the Federal Rules of Civil Procedure and the Court's Local Rules. *See* Fed. R. Civ. P. 56(c); CDIL-LR 7.1(D). Accordingly, the Court considers the statement undisputed.

[4] Plaintiff disputes this statement because "Smick's claimed motivations are not facts and her conduct evidenced steps to avoid accommodating Nelson's doctor's reasonable recommendations." Doc. 30, at 13. However, Plaintiff fails to support this alleged factual dispute with any citation to the record. A better response may have been to admit that Smick made the statement but dispute that Smick's stated reasons were her actual motivations.

her, prompting a conversation between Smick and Nelson where Smick advised that Morton was trying to make sure it met all of Nelson's medical needs and had questions about incandescent versus LED bulbs, what wattage was needed, whether they needed to put glare screens on the monitors, fluorescent lighting in the remaining building, and whether there was a time limit on how long the lamp lighting was needed.[5] Nelson then told Smick that she would not sign a general medical release and that all Smick needed to worry about is indirect incandescent lighting like Dr. Bond had requested. Although Dr. Bond's initial recommendations only mentioned incandescent lighting, at some point (the parties dispute when) Nelson later stated that she needed *indirect* incandescent lighting. *See* Doc. 29, at 9. Smick and Nelson then exchanged emails concerning Morton's request for additional information and Smick advised that Morton would provide a floor lamp to use next to her console with the overhead lighting in the dispatch room turned off. Doc. 30, at 9–10.

When Nelson returned to work in August of 2015, Morton turned off the overhead lighting when Nelson was working and provided a floor lamp in the back of the room and incandescent table lamps for the consoles. Nelson did not know if Smick ever received the answers to all of her specific questions about Nelson's need for accommodations. Smick felt that her efforts to get the information from Nelson were met with resistance. After Nelson returned to work in August, while she was not unhappy with the lamps, her coworkers complained that the lamps hanging directly over the computer monitors were causing more of a glare and they did not like the lamps because they were dim. At the time, Morton employed seven dispatchers, and

---

[5] Plaintiff disputes this statement because "Smick's claimed motivations are not facts and her conduct evidenced steps to avoid accommodating Nelson's doctor's reasonable recommendations." Doc. 30, at 14. However, Plaintiff fails to support this alleged factual dispute with a citation to any evidence in the record, as required by the Federal Rules of Civil Procedure and the Court's Local Rules. *See* Fed. R. Civ. P. 56(c); CDIL-LR 7.1(D). Accordingly, the Court considers the statement undisputed.

while Nelson worked alone on third shift, there was a transition period at the beginning and end of her shift where more than one dispatcher was on duty. Morton later had the other dispatchers document their concerns with the lighting and send them to Chief Hilliard. *Id.* at 10–11.

On September 22, 2015, Chief Hilliard wrote to Nelson requesting a meeting to discuss possible accommodations "to prepare for a situation where you may be working with others who require lighting while working." Nelson emailed Hilliard the next day, September 23, 2015, acknowledging that she was aware of her coworkers' complaints about the lamps. The two exchanged emails on the lighting in the dispatch center for the next two days. *Id.* at 11.

Between September 25, 2015 and October 2, 2015, Nelson had email and voicemail exchanges with Smick about her lighting needs and Morton's request for additional information. Smick testified at her deposition that her goal was to meet with Nelson and discuss other types of accommodations that Morton could make since the lamps were an issue with other dispatchers.[6] Morton did not purchase a different type of lamp after receiving the complaints from other dispatchers because it was hard to buy a regular incandescent light bulb, and Morton was trying to determine if they could use LED lights and what the best wattage would be.[7] *Id.* at 11–12.

---

[6] In her Response, Plaintiff disputes Smick's true motivations, and further asserts that "based upon the sequence of events, the court could infer Smick was engaging in a sham process to do anything but provide sufficient indirect incandescent lighting for all the dispatchers including Nelson." Doc. 30, at 19. First, while questions involving intent are ordinarily questions of fact for the jury, "even when issues of intent are involved, summary judgment is appropriate if in response to a properly supported motion for summary judgment, the non-movant fails to offer specific facts to show that there is a genuine issue for trial." *Cat Iron, Inc. v. Bodine Envtl. Servs., Inc.*, No. 10-CV-02102, 2011 WL 5078206, at *5 (C.D. Ill. Oct. 25, 2011)
(citing *Corrugated Paper Prods., Inc. v. Longview Fibre Co.*, 868 F.2d 908, 914 (7th Cir. 1989) ("It is well-settled that summary judgment may be granted where the controlling issue is whether or not the movant acted with a particular mental state.")). Here, Plaintiff again fails to support the alleged factual dispute with a specific citation to any evidence in the record, as required by the Federal Rules of Civil Procedure and the Court's Local Rules. *See* Fed. R. Civ. P. 56(c); CDIL-LR 7.1(D). Accordingly, the Court considers the statement undisputed.

[7] In her Response, Plaintiff disputes Defendant's statement of fact because "the claim that it was hard to buy an incandescent light bulb is bellied [*sic*] by the fact that Morton had just bought three incandescent lights to light the dispatch room." Doc. 30, at 14. Here, Plaintiff again fails to support the alleged factual dispute with a specific citation to any evidence in the record, as required by the Federal Rules of Civil Procedure and the Court's Local Rules. *See* Fed. R. Civ. P. 56(c); CDIL-LR 7.1(D). Accordingly, the Court considers the statement as undisputed.

Smick also gave Nelson a form for Dr. Bond to complete with additional questions, and Nelson agreed to have Dr. Bond fill out the form at her October 14, 2015 appointment. Nelson returned the completed form from Dr. Bond on October 14, and on October 21, 2015, Smick emailed Nelson that the information provided by Dr. Bond did not provide sufficient information and Morton was sending Nelson for an independent medical examination with Dr. Kenneth Barba scheduled for October 26, 2015. *Id*. at 12.

Nelson did not have any fluorescent lighting in her home. On October 23, 2015, Nelson emailed Chief Hilliard and Deputy Chief Miller from home, stating "I sorta got blurry eyed and lost my vision on the stairs and fell down a flight of stairs." Chief Hilliard's notes reflect that Nelson told him after this incident that she fell as a result of her eyes becoming blurry, which is something that happens to her frequently, but Nelson cannot remember if she made this statement to Chief Hilliard. On October 27, 2015, Dr. Barba completed a form submitted by Morton stating that Nelson has no useful vision in her left eye and "history of optic neuritis in right eye (inflammation of optic nerve)" and noted that "indirect incandescent lighting can greatly alleviate strain and discomfort." At the time of her October 26, 2015 visit with Dr. Barba, he did not believe Nelson had optic neuritis in her right eye and did not believe she had a disability. *Id*. at 12–13.

When Smick received the completed form, she followed up with Dr. Barba with additional questions, to which Dr. Barba provided the following response: "difficult to say what type of lighting is best for her. I am not aware of any hard evidence to suggest something specific is best or detrimental for her situation. I can only make suggestion based on her description of what types of lighting work best for her." On December 3, 2015, Smick spoke with Dr. Barba who told her that in his opinion Nelson's eye condition in her right eye did not substantially limit

her ability to see; he knew of no specific accommodations that would help her with eye strain and her subjective view of what helps is what he relied on; and he hadn't seen any documentation that fluorescent lighting affects eyesight generally or her right eye issues.[8] *Id.* at 13–14.

On December 4, 2015, Smick emailed Nelson that based upon the information Morton has been provided, it determined that her vision issue did not meet the requirements for the ADA and Morton was not required to provide accommodations to the lighting in the dispatch center and the incandescent lights would be removed and the fluorescent lights would be required to remain on at all times. At that time, the lamps were removed because accommodating Nelson was causing issues with other dispatchers who complained that they could not see. On December 8, 2015, Nelson emailed Smick, Mayor Rainson, Chief Hilliard, as well as her Fraternal Order of Police representative William Jarvis and Village Attorney Tom Davies, stating that she spoke with the EEOC and they said Morton must provide the specific reason for the denial and

---

[8] In her Response, Plaintiff states,

> This DSOF is disputed, because Dr. Barba did not recall telling Smick that no specific accommodations that would help her with eye strain and Nelson's subjective view is what he relied on. Dr. Barba testified regarding Smick's note "that it almost sounds to me like where it is written that there is specific evidence on the lighting for one condition or another so he would base his recommendation on what the patient's subjective view was.["] (Barba Dep. 22-23).

Doc. 30, at 15. The portion of Plaintiff's Response that purports to quote Dr. Barba is not, in fact, an accurate recitation of the deposition transcript. What Dr. Barba actually said was:

> So it almost sounds to me like where it's written he knows of no specific accommodation that would help with her eye strain, it sounds more like a reference to I don't know of any specific evidence that would suggest that there's a particular kind of lighting that would be required for one particular condition versus another. So then it seemed to be followed up with her subjective view of things is really what I would base a recommendation on.

Doc. 29-9, at 7. In sum, Plaintiff misstates Dr. Barba's testimony. Further, Plaintiff' assertion that "Dr. Barba did not recall telling Smick that no specific accommodations that would help her with eye strain" is not supported by the record. *See id.* ("Q. And then according to Julie Smick's notes it indicates that you had said to her that you haven't seen any documentation that fluorescent lighting affects eyesight generally or her right eye issues. Would you agree with that statement? A. I would, yeah."). Lastly, Plaintiff's response fails to inform the Court as to what exactly Plaintiff is disputing. The Court therefore considers this statement undisputed.

attaching links for information on accommodations. On December 10, 2015, Smick emailed Nelson with Morton's response to why it did not believe that Nelson had a disability and requested that Nelson provide specific, detailed documentation from her physician which contradicts the information it had been provided and the matter would be reviewed again. On December 11, 2015, Nelson emailed Smick advising that she would drop off additional information from the EEOC's website. On January 1, 2016, Nelson called in sick to work because of blurred vision that occurred while she was at home; she did not know what caused her blurred vision or how long it lasted. *Id*. at 14–15.

In February 2016, Morton obtained proposals from two electrical contractors to replace the fluorescent lighting with LED fixtures and dimmer switches. Defendant asserts that the purpose of bringing in the electricians was to determine what lighting was appropriate because Nelson stated that she wanted torchiere sconces on the walls that would require having the building rewired. Plaintiff disputes that this was the actual purpose, as Morton had already informed Nelson on December 4, 2015 that she did not have a disability and would not accommodate her. *Id*. at 15; Doc. 30, at 15.

On February 26, 2016, Nelson emailed Chief Hilliard, Deputy Chief Miller, Smick, Attorney Davies and Mayor Rainson after experiencing another vision disturbance stating, in relevant part,

> The solution that him, my neurologist and OSF came up with for when my vision blurs to where I can't see works but takes several hours to get my vision back. There is no definite time or specific action that causes it that we are able to track and unfortunately it comes on immediately. While they have equipped me with the knowledge how to help it when it happens, I don't know if there is any way to Void it other than more medications than I already take. I've requested he and my neurologist get together to see if there is perhaps a quicker remedy for when it happens. Unfortunately it occurs in my "good eye" and I have absolutely no useful vision in my left eye to compensate when this happens. So I am for all intents and purposes blinded enough that I can't see to drive let alone do my job.

8

Doc. 29, at 15–16. Nelson stated in her deposition that at times her vision would come back "in a matter of hours," but not 100%, she did not know what caused it, did not know what would help, and she could not have driven or read the computers at work.[9] On March 1, 2016, Nelson met with Chief Hilliard who placed her on unpaid leave until she could "provide a statement from your Doctor that this condition is under control and will not occur while on duty. This leave is for the safety of yourself and that of the public." Defendant claims that Chief Hilliard requested this statement from Nelson's doctor because Nelson had already fallen down her own steps at home and he did not want something to happen to her at work, especially because her condition would come on suddenly and there was no forecasting when it would come. Plaintiff disputes that this was in fact Hilliard's motivation. Doc. 29, at 15–16; Doc. 30, at 15.

On March 2, 2016, Deputy Chief Miller gave Nelson FMLA paperwork to allow her time off. On March 4, 2016, Morton received a revised proposal from an electrical contractor to change the lights in the dispatch center.[10] After Nelson had difficultly having her doctor complete the FMLA paperwork, Smick emailed Nelson on March 11, 2016 asking for permission to contact Nelson's treating physician for the sole purpose of explaining Morton's reasons for placing her on leave and also providing Nelson with ADA forms for Nelson and her physician to complete.[11] On March 15, 2016, Nelson's current attorney wrote to Smick requesting that Nelson

---

[9] Plaintiff lists this fact as disputed in her Response because "Nelson and all of her doctors indicated that florescent lighting irritated Nelson's optic nerve." Doc. 30, at 20 (citing Nelson Dep. at 127–28; Smick Dep. at 51). However, Defendant's statement of fact began with "Nelson stated" and cited to the specific portion of Nelson's deposition transcript where Nelson did in fact make those statements. Moreover, Plaintiff's citations to record do not support her assertion of a factual dispute. The Court therefore considers the statement undisputed.

[10] Plaintiff lists this fact as disputed in her Response because "Morton had already asserted Nelson did not have a disability and would not accommodate her." Doc. 30, at 15–16. But Defendant's statement is that it received a proposal from a contractor to change the lights; it has nothing to do with Morton's intent. The Court thus considers this statement undisputed.

[11] Plaintiff lists this fact as disputed in her Response because "Nelson's doctor could not complete FMLA paperwork because he had repeated opined Nelson could work with a lighting accommodation." Doc. 30, at 20 (citing Bond Doc. 24–26; Morton Doc. 196–197). There are numerous issues with Plaintiff's statement. First, nothing in the record indicates that Dr. Bond *could not* complete the FMLA paperwork. Rather, Plaintiff seems to argue that Dr.

be immediately returned to work with her doctor's original request for incandescent lighting implemented. On March 16, 2016, Smick responded to Nelson's attorney insisting that Nelson cooperate with her obligations under the ADA interactive process to provide Morton with sufficient information to determine what reasonable accommodation, if any, exists. *Id.* at 16–17.

On April 7, 2016, Nelson's treating physician Dr. Bond completed the ADA paperwork but Nelson did not complete the Request for Accommodation form. In the form completed by Dr. Bond and provided to Morton, he indicates that her impairment is "past optic neuritis in the useful eye (other eye blind secondary to glaucoma)." On April 25, 2016, Smick wrote to Nelson and her attorney requesting a meeting on May 3, 2016 to determine a reasonable lighting accommodation that could be made in the dispatch center to meet Nelson's needs. On May 3, 2016, Smick wrote to Nelson and her attorney to reschedule the meeting to May 11, 2016 after they failed to appear. On May 11, 2016, Nelson and her attorney appeared for an interactive process meeting at Morton with Smick, Chief Hilliard, and Attorney Davies. During that meeting Nelson stated, in relevant part, that since she sent the email of February 26, 2016 concerning her blurry vision; she has had episodes since then but does not know how many; she does not know what triggers the condition, which has happened at her home with incandescent lighting and at work, but she can't say what's causing it; if her vision disturbance happened at work she could not see the computers or put anything into the computer; and her doctors have no idea how long her condition will last.[12] During the meeting, Nelson was given copies of the lighting proposals

---

Bond's answers to the paperwork would not entitle her to FMLA leave. Second, Plaintiff fails to dispute that Nelson was also provided *ADA* paperwork to complete with her physician—specifically, a "Request for Accommodation Form" to be completed by Nelson and a "Medical Inquiry Form in Response to an Accommodation Request" to be completed by her physician. Doc. 29-4 at 27–28. The Court thus considers Defendant's statement undisputed.

[12] Plaintiff lists this fact as disputed in her Response because "Nelson stated that since her initial episode of blurry vision on June 15, 2015, she had episodes of blurry vision but did not know how many. (Morton Doc. 1248)." Doc. 30, at 21. Since the purported dispute—she has had episodes since then but does not know how many—is actually included in Defendant's statement of fact, the Court finds this statement is not disputed.

from the electricians and Nelson stated that the proposals would not meet her restrictions because the lighting would be direct. *Id*. at 18–19.

On May 23, 2016, Smick emailed Nelson and her attorney advising that Morton was scheduling an analysis of the lighting at the police station with an electrical engineer to determine how they could offer a reasonable indirect lighting solution for Nelson without causing a detriment to her coworkers, advising that Morton would pay Nelson from the date she ran out of benefit time and would continue to pay her until Morton is able to return her safely to work, or until other notice is provided to her, and that Morton was requiring her to have an independent medical examination ("IME") with Dr. Kattah.[13] On May 26, 2016, Nelson emailed Smick that she had an appointment on July 26, 2016 and this was the first available appointment that she could get. On June 17, 2019, Morton received a proposal from Midwest Engineering Professionals with a proposal to change the lighting in the dispatch center. *Id*. at 19.

On July 30, 2016, Dr. Kattah wrote to Chief Hilliard following his IME of Nelson stating that her only current medical condition is a migraine, reporting that Nelson told him

> that she has episodes of visual changes in the right eye about twice weekly; this is associated with headache, neck pain and eye pain. Apparently the headache last in average 6 hours and the visual disturbance about 1 hour. I do not have any idea about the effect of fluorescent lights in different individuals. This being said, she tells me that they can be at times a precipitating factor. This of course is her perception. Over the years, I have learned from migraine sufferers that environmental, smells, sound, light variations, stress, etc are common migraine triggers. This is common, rather than exceptional. In so far as when would this last? I do not know. In general post-menopausal women tend to have fewer migraines.

---

[13] Plaintiff lists this fact as disputed in her Response because "Morton had already asserted Nelson did not have a disability and would not accommodate her." Doc. 30, at 16. But Defendant's statement is that Smick emailed Nelson to advise her that Morton was scheduling an analysis of the lighting, and Defendant supported that statement with a citation to the record identifying the email in question. *See* Doc. 29-4, at 45. The Court thus considers this statement undisputed.

Doc. 29-5, at 9. On August 9, 2016, Smick received a lighting proposal from Midwest Engineering Professionals related to the dispatch room lighting. On or about August 15, 2016, Morton received Dr. Kattah's medical records from the July 26, 2016 IME which stated, in relevant part, "The patient recovered substantially, but she has episodes of blurred vision in the right eye. She has shooting pain in the right neck pain and behind the right eye (shtarp (sic)). Shooting pain and visual blurring and in right side. She probably had left amblyopia. She has episodes as frequent as twice a week and as infrequent for 2-3 weeks." *Id*. at 19–20.

The parties dispute what Dr. Kattah's opinion was regarding Nelson's ability to perform her job as of July 2016. Defendant asserts that Dr. Kattah's opinion is that Nelson would not be able to perform her job as a dispatcher if she was having a visual disturbance. Plaintiff disputes this statement because "Dr. Kattah's opinion was based on Nelson's symptoms as of June 2015, not as a result of his July 2016 exam. Dr. Kattah opined that Nelson would not be able to perform her job if 'he just assumed' that Nelson could not see. Dr. Kattah's notes indicate that Nelson's visual disturbances as of July 2016 did not include blinding, blurry vision. Rather, they indicate that she saw floaters and flashes of light." Doc. 30, at 16.

On September 20, 2016, Smick wrote to Nelson terminating her employment. Smick's stated reasons for Nelson's termination were Nelson's inability to perform the essential functions of her job with or without accommodation and due to the danger posed to herself, her co-workers and the public if the Village were to bring her back to work. In making this decision, Morton stated that it considered whether there were any open positions within the entire Village for which she would be qualified to perform and no such positions existed since the time of her leave.[14] In the termination letter, Smick further stated that, based on Nelson's statements to Dr.

---

[14] Plaintiff disputes this statement because "Nelson could perform her job with accommodation and the motivations and credibility of the Village's witnesses are questions of fact." Doc. 30, at 17. The Court has framed this statement

Kattah on July 26 that she has episodes of visual changes in her right eye about twice weekly that last about 1 hour and there was no definite date by which they will resolve, Morton concluded that there was no evidence that changes to the lighting in the dispatch room would prevent such occurrences since they had continued on a regular basis over the past five-plus months without Nelson working in that lighting environment.[15] Doc. 29, at 21.

At the time Morton terminated Nelson, Chief Hilliard did not believe that Nelson could perform any job duties that called for visual acuity, including: operating the radio console, which is a keyboard; seeing the computer screen to make an entry; entering information from emergency calls into the computer-aided dispatch system; bringing up the right screen on the computer and moving the cursor to the appropriate spot and entering information; reading instructions on emergency medical dispatch cards; or reading or entering information in LEADS or NCIC, the state and federal data systems.[16] There was never a point in time while Nelson was working for Morton or while she was on leave where she could definitively determine what would cause her vision disturbances so she could avoid it.[17] Once Nelson had an episode of

in terms of Defendant's *stated* reasons for Nelson's termination, and thus does not address Defendant's actual motivations at this time. *See* Doc. 29-5, at 28 (termination letter).

[15] Plaintiff disputes this statement because "Nelson described her symptoms to Dr. Kattah when her condition was acute and Dr. Kattah had no reason to dispute same. The Village ignored Dr. Kattah's statement that he had no reason to dispute Nelson's statement of her current condition and did nothing after being advised of same 'because there was no need.' Dr. Kattah reviewed Nelson's job duties and did not see any reason why she would not be able to perform her job duties. (Kattah Dep. 9; Smick Dep. 51)." Doc. 30, at 17–18. However, the statement at issue sets forth Defendant's stated reasons for Nelson's termination. Those statements were either in the letter or they were not. Plaintiff does not dispute what Smick stated in the letter, and thus the Court considers the statement undisputed. *See* Doc. 29-5, at 28 (termination letter). Lastly, although the Court addresses this statement as disputed by Plaintiff, Plaintiff also marked this statement as undisputed and immaterial. *See* Doc. 30, at 33.

[16] Plaintiff lists this statement as disputed because "Nelson had been able to perform her duties with accommodation. (Smick Dep. 21)." Doc. 30, at 18. But the statement at issue is what Chief Hilliard believed at the time Nelson was terminated, not whether she was in-fact able to perform her job. The Court thus considers the statement undisputed.

[17] Plaintiff disputes this statement "because Nelson indicated, as well as all of her doctors indicated, that florescent lighting agitated her optic nerve." Doc. 30, at 21. Plaintiff fails to cite to the specific portions of the record indicating that Nelson's doctors stated florescent lighting caused Nelson's symptoms. Moreover, Defendant's statement is taken directly from Nelson's deposition:

blurry vision, there was no way to determine how long the vision disturbance would last, and the longest would have been over a day.[18] At the time that she was experiencing these symptoms, Nelson's doctors could not say how long this condition would last. *Id*. at 21–22.

## 2. Nelson's Sexual Harassment Complaints

In April 2012, Nelson complained to Chief Hilliard and Deputy Chief Jason Miller that she was being sexually harassed by Mark Clemmer, an outside contractor hired by Morton to clean the police department. In response, Deputy Chief Miller spoke with Clemmer and then advised Nelson that he told Clemmer that "it didn't matter if Mark thought it was inappropriate or not . . . that in the future if anybody asks him or tells him it's inappropriate he needs to stop discussing whatever he's discussing." Nelson was satisfied with the way Deputy Chief Miller handled her complaint. Chief Hilliard also spoke with Clemmer and told him to cease his conversation if it bothered Nelson. *Id*. at 22–23.

Nelson called Deputy Chief Miller on June 20, 2012 to complain that Clemmer refused to speak to her and sat in the dispatch room waiting for the other dispatcher.[19] Deputy Chief Miller told Nelson that he advised Clemmer that he was not to be in the Dispatch Center for any reason and that if he did return to the room that Nelson should contact Deputy Chief Miller immediately and Miller would speak with Chief Hilliard about this when the Chief got back from vacation.

---

Q. Okay. Was there ever a point in time while you were working at the Village of Morton, and even the time that you were placed on leave, where you could definitively determine what would cause your vision disturbances so you could avoid it?
A. No. **I don't have any idea of what brought it on**. What stressors caused it. And **I don't believe that any of my doctors ever figured it out either**. They knew what didn't cause it.

Doc. 29-1, at 53 (emphasis added). The Court therefore considers the statement undisputed.
[18] Plaintiff lists this statement as disputed and immaterial, but only addresses its materiality, stating that it is immaterial for the same reason that DSOF 80 is immaterial. Doc. 30, at 21. The Court therefore considers the statement undisputed.
[19] Plaintiff lists this statement as disputed because "Clemmer was perched on a filing cabinet over another dispatcher who was on the phone. Nelson wanted to know what he wanted because the other dispatcher was busy. He wouldn't say what he wanted. (Nelson Dep. 37; Morton Doc. 4)." Doc. 30, at 18. Reciting Defendant's statement in more detail does not create a factual dispute. The Court therefore considers the statement undisputed.

On June 20, 2012, Nelson wrote to Chief Hilliard about the incident that day with Clemmer and then followed up with a July 24, 2012 email. Nelson could not recall what Chief Hilliard's response was to this memo and could not recall if she had any other complaints about Clemmer in 2012 after sending the memo and email. Chief Hilliard told Clemmer to stop talking to Nelson because every conversation they had caused a problem between the two. Between the July 24, 2012 email and her next complaint in June 2015, Nelson cannot recall any specific incident where she saw Clemmer or made any complaints about him other than one conversation she believes took place in 2015 where Clemmer allegedly referred to Nelson as being frigid and said his brother had gotten out of prison and was staying with him and knew how to handle girls like her in the hood and that his brother knew how to take care of frigid girls like her. *Id*. at 23.

In June 2015, Clemmer made what Nelson described as a benign comment that he was not talking to her, which she did not consider threatening but found annoying. On June 2, 2015, Nelson emailed Chief Hilliard and Deputy Chief Miller to complaint about Clemmer and requesting that Morton terminate Clemmer because she wanted to change shifts. Nelson could not identify the last time that Clemmer touched her and could not identify what year he stopped. Chief Hilliard and Deputy Chief Miller spoke with Clemmer on June 5, 2015 about Nelson's complaint and Clemmer stated that he had not had any contact with Nelson for a long time, he complied with the prior directive to not enter the dispatch center when Nelson was present, and Nelson agrees that was true. Chief Hilliard told Clemmer that even though Nelson's complaints had been addressed in 2012 and there had been no further issues, Clemmer was not allowed in the building and Clemmer's employee James would be in the building, and if James needed assistance that Clemmer would have to first arrange that with Chief Hilliard or Deputy Chief Miller so that one of them could be present. *Id*. at 24–25.

On June 10, 2015, Chief Hilliard met with Nelson and told him that they met with Clemmer and that one of Clemmer's employees, James, would be cleaning the building as opposed to Clemmer and Clemmer would only be in during a major event such as stripping the floors and then only after prearranging with Chief Hilliard or Deputy Chief Miller. Nelson wanted Clemmer fired as the janitorial service and when Chief Hilliard refused, she requested that Morton remove Clemmer's clearance codes to get in the building and Chief Hilliard refused. Nelson then told Chief Hilliard that she intended to go to the mayor over the Clemmer situation. Nelson does not recall any time when Clemmer came into the police department without permission after June 2015 and she never saw him in the police station. On June 11, 2015, Nelson emailed Morton mayor Ron Rainson with her complaint about Clemmer and Smick spoke with Nelson on June 12, 2015 to discuss her concerns. On July 8, 2015, Nelson emailed Mayor Rainson and Smick a written complaint of harassment. *Id*. at 25.

No one in a supervisory position in Morton ever told Nelson that she would lose her job because she made this complaint. Smick investigated Nelson's complaints and determined that Nelson had not identified any current conduct by Clemmer, but Nelson was more concerned that Clemmer had not been fired and she was concerned about him having access to the police station. On September 2, 2015, Nelson received a letter from Morton in response to her workplace complaint finding that the issues raised in her complaint were resolved in 2012. After receiving this response, Nelson did not have any further contact with Clemmer. On January 19, 2016, Smick emailed Nelson that Morton was in receipt of a Notice of Charge of Discrimination brought by Nelson, although Morton had not yet seen the actual Charge. On March 9, 2016, Nelson filed a Charge of Discrimination with the EEOC.

Summary judgment is appropriate where the movant shows, through "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In resolving a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

In order to withstand a motion for summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When presented with a motion for summary judgment, the Court must construe the record "in the light most favorable to the nonmovant and avoid[] the temptation to decide which party's version of the facts is more likely true." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). If the evidence, however, is "merely colorable, or is not significantly probative or merely raises 'some metaphysical doubt as the material facts,' summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50. Thus, in order to overcome the undisputed facts set forth in a defendant's motion for summary judgment, a plaintiff cannot rest on the allegations in his complaint but must point to affidavits, depositions or other evidence of an admissible sort that a genuine dispute of material fact exists between the parties. Fed. R. Civ. P. 56(e)(2); *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).

In Defendant's Motion for Summary Judgment, it argues that (1) Nelson is not a qualified individual under the ADA; (2) Nelson cannot succeed on her disability discrimination claim; (3) Nelson cannot succeed on her failure to accommodate claim; (4) Nelson cannot establish her claims of retaliation; and (5) Nelson's condition posed a direct threat. *See generally* Doc. 29. The Court will first address the issue of whether Nelson was a qualified individual under the ADA.

**1. Whether Nelson is a Qualified Individual Under the ADA**

The Americans with Disabilities Act protects qualified individuals from discrimination on the basis of disability. 42 U.S.C. § 12112. A "qualified individual" is an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 U.S.C. § 12111(8). A "reasonable accommodation" may include making existing facilities used by employees readily accessible to and usable by individuals with disabilities, and/or job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. § 12111(9).

Courts apply a two-part test to determine whether someone is a qualified individual with a disability. First, courts consider "whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." *Basith v. Cook Cty.*, 241 F.3d 919, 927 (7th Cir. 2001) (internal quotations omitted). If a plaintiff can establish that he or she meets the perquisites for the position, a court must next consider "whether or not the individual can perform the essential functions of the

position held or desired, with or without reasonable accommodation." *Id*. (internal quotations omitted). Here, Defendant concedes that Nelson met the prerequisites of the position, but asserts that at the time she was fired, Nelson could not perform the essential functions of the position, and was thus not a qualified individual under the ADA. Doc. 29, at 28, 29.

   *a. Whether Nelson was Able to Perform Her Job Without Accommodation*

   The parties do not dispute that, as a 911 dispatcher, Nelson would answer emergency calls, enter the information into a computer-aided dispatch program by using codes and by completing a freeform narrative section, and use preprinted cards to ask the caller questions specific to the nature of the call. She would also input a license plate or driver's license into the LEADS/NCIC program run by the Illinois State Police and then send the response back to the requesting police officer verbally or through the requesting police officer's in-car laptop computer. The parties do not dispute that an essential function of Nelson's job was the ability to see, because as a 911 dispatcher, she must be able to read the information on the relevant emergency response cards, input information from 911 calls into the computer, and make phone calls to the proper first responders. The parties do not dispute that when Nelson had episodes of blurry vision she was unable to perform the above duties.

   Plaintiff attempts to create a dispute of fact by asserting that Nelson was not suffering from episodes of blinding, blurry vision when Defendant terminated her employment on September 20, 2016. In support of her argument, Plaintiff relies on Nelson's deposition testimony and Dr. Kattah's July 2016 examination of Nelson. The Court will discuss, *infra*, both Nelson's deposition testimony and Dr. Kattah's examination. Based on these records, Plaintiff claims that by September 2016, "Nelson's optic neuritis had resolved and she was not experiencing episodes of blinding, blurry vision." Doc. 30, at 42. The problem with Plaintiff's

argument is that, if her vision issues really did subside by September 2016, there is no evidence in the record that she ever told Morton.

First, Plaintiff points to her deposition testimony to support her argument that she was not suffering from vision problems in September 2016. In her deposition, Plaintiff stated:

> Q. So you're saying in July 2016 you didn't have any problems with your vision?
> A. I don't remember any significant problems, no.
> Q. And did you have any blurry episodes in July 2016?
> A. Not that I recall.
> Q. Any headaches in July 2016?
> A. Not anything abnormal that I remember.
> Q. Did you have any problems after that, after July of 2016, with blurriness or pain or –
> A. I had some dry eye contact blurriness, but not like losing my vision.
> Q. Yeah.
> A. I didn't really have problems after it healed up.
> Q. Okay. I want to show you what's been marked as Deposition Exhibit 116. And these are notes from a visit to Bond Eye Associates on March, on <u>September 13, 2016</u>.
>  A. Uh-huh.
> Q. According, do you remember seeing the doctor on that day?
> A. I went, I'm sure I went to him on that day, I mean.
> Q. So according to the history from this visit it says that<u> you presented for evaluation of blurry vision in the right eye and left eye that you stated that when you first wake up in the morning you will have blurry vision for a few hours and you note that during the day for hours there is clear vision, and the blurry vision returns in the evening</u>. Is that what you were telling them in September 2016?
> A. That's not what I went to the eye doctor for. I was having some dry eye issues with my contacts and blurred vision. My vision itself wasn't blurred when I take the contacts out. I was –
> Q. But did you tell them, did you tell the doctor's office? I mean, they wrote this down. Did they hear it from you? Like –
> A. I understand. I just told you yes.
> Q. So you did tell them this?
> A. With my con, yeah, I was having dry eye issues.
> Q. But did you tell them though that when you first wake up in the morning you'll have blurry vision for a few hours?
> A. I wake up with my contacts in my eyes, yes.
> Q. But you, that wasn't my question. My question –
>  A. I understand.
>  Q. -- though is <u>did you tell them that when you first wake up in the morning you will have blurry vision for a few hours?</u>
> A. <u>Yes.</u>

Q. And did you tell them that during the day for hours there's clear vision?

A. Yes.

Q. And did you tell them that the blurry vision returns in the evening?

A. Yes.

Q. And did you tell them that sometimes there's pain, sometimes there isn't?

A. I have pain in my left eye sometimes and sometimes I don't.

Doc. 29-1, at 45 (Nelson Dep. 177–80) (emphasis added). Contrary to Plaintiff's argument, this portion of Nelson's deposition establishes that Nelson continued to complain of blurry vision in her right eye at least up to the week before her termination. Plaintiff also cites another portion of her deposition testimony. There, Nelson testified as follows:

Q. All right. Well, look at the page that's Bates stamped CIT Trucks Nine. In the top right column it's referring to your employment with the Village of Morton. And it says in there, again, since being placed on leave in March 2016 I have had no episodes of blurred vision or debilitating headaches since my eye healed. Do you see that?

A. Uh-huh.

Q. Is that yes?

A. Yes. I'm sorry.

Q. Okay. And then you then follow up and you say I have since worked in a direct fluorescent lighting office and have had no problems now that the eye has healed completely. Do you see that?

A. Yes.

Q. And is that true?

A. Yes.

Q. At what point did you feel that your eye healed completely?

A. When I worked under fluorescent lighting and had no pain, no blurred vision or no problems whatsoever.

Q. At Kroger?

A. Yeah. Well, I mean, I don't know that I knew it was healed completely prior to being under continuous fluorescents, so I don't know that I would say Kroger necessarily because it was only a few hours that you're in there. But at Randstad I was under fluorescent lights nine hours a day.

Q. So at the, at the point that you filled this out, this would have been in January of 2018, you hadn't seen an eye doctor since September 2016, correct?

A. I, they, I still had my insurance through December I believe. I don't know if I saw them but it would have been since 2016.

Q. But when you write in here that your eye has healed, no doctor told you that, right?

A. No. No. I was cleared for work from my doctors and they just said it would take time to heal completely.

Doc. 29-1, at 52 (Nelson Dep. 206–08) (emphasis added). This portion of Nelon's deposition supports Plaintiff's position that Nelson's sensitivity to fluorescent lighting subsided by January 2018. However, Nelson's statement that her vision problems ceased by March of 2016 is contradicted by Nelson's own prior statements to Morton. Specifically, on May 11, 2016, Nelson met with Smick for an interactive process meeting. The purpose of the meeting was to discuss possible accommodations for Nelson's episodes of blurry vision. At that meeting, Nelson stated that since her February 26, 2016 email, she has had additional episodes but she did not recall how many. Doc. 29-4, at 38. She stated that "the optic nerve swells due to irritation" and "it's happened at home and it's happened at work but I can't say rather what's causing it." *Id*. at 39. Nelson further stated at the May 11, 2016 interactive meeting that "I wear sunglasses and I keep my shopping to a minimum" to prevent an episode from occurring while out shopping. *Id*. Nelson further stated at the May 11, 2016 interactive meeting that "I don't use any of the overhead lighting on the ceilings" at home and "I very rarely go shopping." *Id*. Nelson further stated at the May 11, 2016 interactive meeting that "I just spoke to Dr. Bond last week. I have to have surgery on Monday again and he reiterated to me incandescent indirect." *Id*. at 42. If she were to have a visual disturbance while at work, she "probably wouldn't be able to put anything into the computer." *Id*. at 42. Nelson further stated that she was continually seeing her physicians "and whenever I have a blurry episode, my neurologist takes films." *Id*. at 43.

In sum, Nelson repeatedly referred to her eye issues in the present tense at the May 11, 2016 interactive process meeting to discuss potential accommodations for her ongoing eye issues. Had her eye issues resolved by May 11, 2016, Nelson would have no need to attend a meeting to discuss accommodations. It thus follows that as of at least May 11, 2016, Nelson was not able to perform the essential functions of her job without accommodation.

Plaintiff also relies on Dr. Kattah's July 2016 examination to create an issue of fact regarding Nelson's condition as of September 2016. Specifically, Plaintiff asserts that "Dr. Kattah's medical records make clear that Nelson had 'recovered substantially' and that her optic neuritis had resolved as of July 26, 2016." Doc. 30, at 41. Plaintiff claims that "Nelson's symptoms were negative other than … eye pain" at the time and Nelson only complained of "floaters and flashes of light at times," making no mention of blinding, blurry vision. Doc. 30, at 41. This misstates the record of Dr. Kattah's evaluation. Rather, the record of Dr. Kattah's July 26, 2016 exam begins, under the heading "CC"[20], with the following:

CC: Currently she is 47 years old. The patient recovered substantially, but she has episodes of blurred vision in the right eye. She has shooting pian [*sic*] in right neck pain and behind right eye (shtarp) [*sic*], Shooting pain and visual blurring and in right side.…
HPI: ….
On 6/15/15 the patient had a episode of diplopia & blurriness in the right eye. She saw her surgeon the next day.… She had pictures of her retina taken at Dr. Bond's office. The patient states she was told the optic nerve on the right side was swollen, but her retina was intact. It began to improve around 6/19/15. She was placed on oral Prednisone 80mg/day for five days (last day 6/21/15). Started to have daily HAs [headaches] since Mon with, bilateral frontal and occipital, Dull HA. Also a dull pain behind R eye that worsens with looking up. Is also seeing floaters and flashes of light at times.… Amsler grid was all blurry per pt in both eyes.…

Patient Active Problem List
Diagnosis
….
Visual loss, right eye
Papilitis, right.…

Review of Systems [*sic*]: Negative other than headache ands eye pain episodes.…

Assessment: 1. Status post episode of right optic nerve swelling, now resolved
2. Amblyopia left eye. 3. Migraine.

[20] According to Dorland's Medical Dictionary, "CC" refers to "Chief Complaint." *CC*, DORLAND'S MEDICAL DICTIONARY, https://www.dorlands.com/dorlands/def.jsp?id=100023198 (last visited August 15, 2019).

Doc. 29-5, at 23–25 (emphasis added). The emphasized portions of the record above make clear that Nelson was complaining of blurry vision in her right eye as of July 26, 2016. A fair reading of the document suggests that, while the objective indica of Nelson's right eye vision problems (the swelling of the optic nerve) had subsided, the patient continued to report episodes of blurry vision. In fact, this interpretation of Dr. Kattah's exam is consistent with Dr. Kattah's July 30, 2016 letter to Morton, which Nelson also relies upon. In that letter, Dr. Kattah responded to Morton's requests for information and stated as follows:

> I saw Mrs. Nelson on 7-26-2016 and she handed me a copy of your Memo. I saw her as an inpatient nearly one year ago; this was followed by a follow up visit shortly after discharge. I had not seen her in the interim. I will proceed to answer your questions:
> 1. Your diagnosis of her condition.
> I was told one year ago by William Bond, M.D., and by the Neurology admitting team that she had a papillitis of the right optic nerve. When I first saw her the optic nerve swelling had resolved. She did not have any evidence of multiple sclerosis. As you know she has very poor vision in her left eye, as a result of detachment. I believe that further details in this regard might be provided by William Bond, M.D. Currently I believe that she has migraine[.]
>
> Answers to a,b,c,d,e
> The patient tells me that she has episodes of visual changes in the right eye about twice weekly; this is associated with headache, neck pain and eye pain. Apparently the headache last in average 6 hours and the visual disturbance about 1 hour. I do not have any idea abou the effect of fluorescent lights in different individuals. This being said, she tells me that they can be at time a precipitating factor. This of course is her perception. Over the years, I have learned from migraine sufferers that environmental; smells, sound, light variations, stress, ect are common migraine-triggers. This is common, rather than exceptional. In so far as when would this last? I do not know. In general post-menopausal women tend to have fewer migraines.
>
> Answers to f, g, 2, 3
> These are all interesting questions. I am afraid to not know the answer to any of them! The patient would probably be the best one to indicate what lights are best tolerated. I suggest that you work with her in this regard. Each migraineur is unique in the triggers. You must realize that I have no way of knowing what affects her, except from her own description; once again this would be typical for migraine rather than an exception.

> In terms of medications for migraine prevention, I will refer Mrs. Nelson to Dr. Nersessyan. I also encourage you to contact Dr. William Bond, M.D. He is her ophthalmologist and knows her well for several years. Moreover he operated her left eye. Finally, I like to indicate that I will not be following Mrs. Nelson, as I do not manage migraine per se. I generally evaluate their visual symptoms, exclude other pathologic processes and if they are difficult to manage them refer them to our "headache clinic."

Doc. 29-5, at 8–10.

Again, a fair reading of Dr. Kattah's letter shows that, while the objective indica of Nelson's right eye vision problems (i.e., the swelling of the optic nerve) had subsided, the patient continued to report episodes of blurry vision. This led Dr. Kattah to believe that Nelson's vision problems were caused by something other than swelling of the optic nerve. When Dr. Kattah's examination records and his July 30, 2016 letter are read together, it is beyond dispute that Nelson continued to complain of visual disturbances—including blurry vision—through July 2016. Again, Plaintiff does not dispute that, when Nelson had episodes of blurry vision, she was unable to perform the essential duties of her job. *See* Doc. 30, at 4, ¶ 6. It thus follows that as of at least July 26, 2016, Nelson was not able to perform the essential functions of her job without accommodation.

### b. Whether Nelson was Able to Perform Her Job with a Reasonable Accommodation

The Court next considers whether Nelson could perform the essential functions of her job with a reasonable accommodation. The Court assumes, for the purposes of this portion of the analysis, that Nelson had always requested indirect incandescent lighting (specifically, torchiere sconces), and that converting the lighting in the dispatch room from overhead fluorescent lighting to indirect incandescent torchiere sconce lighting would be a reasonable accommodation under the ADA. Operating under these assumptions, the question becomes whether Nelson would have

been able to perform the essential functions of her job if Morton accommodated her by changing the lighting as she requested. The answer is "no."

Nelson worked third shift as the only dispatcher. On June 15, 2015, she experienced blurry vision that prevented her from doing her job. After returning from FMLA leave, Nelson provided Morton with a doctor's note indicating that Nelson could not tolerate fluorescent lighting and needed table lamp lighting to perform daily job requirements. Morton then provided Nelson with table lamp lighting and turned off the overhead fluorescent lighting. Nelson repeatedly stated that she did not know what was causing her episodes of blurry vision. Significantly, despite not having fluorescent lighting in her home, Nelson experienced blurry vision at home causing her to fall down a flight of stairs. On October 23, 2015 and January 1, 2016, Nelson called in sick to work because of blurred vision that occurred while she was at home, and she did not know what caused her blurred vision of how long it lasted.

On February 26, 2016, Nelson emailed Morton employees to inform them that she suffered another vision disturbance, it takes hours for her vision to come back after each episode, there is no definite time or specific action that causes the episodes, and the episodes come on immediately. There was no way to avoid the episodes other than taking more medications, and when an episode occurs, she is blinded enough that she can't see to drive or do her job. On March 1, 2016, Chief Hilliard placed Nelson on unpaid leave until she could provide a statement from her physician that her condition was under control and would not occur while at work. Nelson then went on FMLA leave again. When Morton met with Nelson for the interactive process meeting in May 2016, Nelson again repeated that she had episodes of blurry vision but did not know what triggered them or how long her condition would last, and if she suffered an episode at work she would not be able to perform the essential functions of her job. As of July

26, 2016, Nelson continued to report to her physicians that she suffered from blurry vision, despite not working as a dispatcher for months.

In light of the above, at the time Morton terminated Nelson's employment, based on the information provided to Morton, it was reasonable for Morton to conclude that changes to the lighting in the dispatch room would not prevent Nelson's episodes of blurry vision. Moreover, Nelson never requested any other accommodation,[21] and appeared to reject all of Morton's other proposed accommodations.[22] Significantly, if Nelson's vision issues had improved between June of 2015 and her termination in September of 2016, there is no indication in the record before the Court that she ever informed her physicians or anyone at Morton of this fact. Accordingly, the Court finds that Nelson was not a qualified individual under the ADA because she would not have been able to perform the essential functions of her job even if Morton accommodated her by changing the lighting as she requested. For these reasons, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's disability discrimination and failure to accommodate claims.[23]

## 2. Nelson's Retaliation Claims

Defendant also moves for summary judgment on Plaintiff's retaliation claims. In order to establish a claim of retaliation, a plaintiff must show (1) she was engaged in a statutorily

---

[21] Nelson also argues that Morton could have accommodated her vision issues by allowing her to use her accrued leave and sick time when she had an episode of blurry vision. Doc. 30, at 45. This argument fails for multiple reasons. First, Nelson never requested this accommodation. Second, allowing Nelson to use her accrued leave time with little to no notice to Morton would not be a reasonable accommodation given that Nelson worked as the only third shift police dispatcher. *See, e.g., Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999)("We think it also fair to conclude that in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability. The fact is that in most cases, attendance at the job site is a basic requirement of most jobs.").

[22] Morton asked Nelson to sign a medical release so that Morton could speak with Dr. Bond regarding other potential accommodations, such as LED lighting or glare screens. Doc. 29, at 9–10. Nelson refused. Doc. 29-2, at 57.

[23] Because the Court finds that Nelson was not a qualified individual under the ADA, it need not address Defendant's alternative arguments that Morton made good faith efforts to accommodate Nelson or that Nelson was a direct threat to the public.

protected activity; (2) she suffered a materially adverse employment action; and (3) there was a causal link between the two. *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 494 (7th Cir. 2014). Here, the first two elements are not disputed. Nelson engaged in protected activity when she requested an ADA accommodation and when she complained of sexual harassment to Morton officials in June of 2015.

In her Response to Defendant's Motion for Summary Judgment, Plaintiff asserts in summary fashion that "[c]ontrary to the Village's argument, summary judgment is not appropriate on Nelson's retaliation claims, because there is evidence that the stated reasons for placing Nelson on leave, and then terminating her, were pretextual." Doc. 30, at 60. The remainder of Plaintiff's argument is simply that Morton's stated reason that allowing her to work posed a threat to the public is disingenuous, and therefore Morton's "rationale for placing Nelson on involuntary leave constituted pretext and precludes a summary judgment on her retaliation claims." Doc. 30, at 61. Plaintiff has waived her Title VII claim by failing to respond to Defendant's Title VII retaliation argument. Thus, the Court will address only the ADA retaliation claim.

Plaintiff bases her ADA retaliation claim on the same facts as her failure to accommodate claim. Given the Court's ruling, *supra*, Plaintiff cannot establish that Morton's reason for terminating Nelson's employment was pretextual or disingenuous. Accordingly, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's retaliation claims.

**CONCLUSION**

For the reasons set forth above, Defendant's Motion (Doc. 29) for Summary Judgment is

GRANTED.

The Clerk is directed to close the case.


Signed on this 20th day of August, 2019.

s/ James E. Shadid
James E. Shadid
United States District Judge